# IN THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## AT NASHVILLE

| | | |
|---|---|---|
| **TARA CAPPS, as administrator** | ) | |
| **Of The Estate of MARK CAPPS,** | ) | **Case No.** |
| | ) | |
| **Plaintiff,** | ) | **Judge** |
| | ) | |
| **vs.** | ) | **Magistrate Judge** |
| | ) | |
| **METROPOLITAN GOVERNMENT** | ) | |
| **OF NASHVILLE-DAVIDSON** | ) | |
| **COUNTY, TENNESSEE,** | ) | |
| | ) | **JURY DEMAND** |
| **And** | ) | |
| | ) | |
| **ASHLEY COON,** | ) | |
| | ) | |
| **Defendants.** | ) | |

## COMPLAINT

1. **Plaintiff Tara Capps ("Mrs. Capps")** brings this federal civil rights claim for damages as **administrator of the Estate of Mark Capps ("the Estate")** against **Defendant Metropolitan Government of Nashville and Davidson County, Tennessee ("Metro")** and **Defendant Ashley Coon ("Coon")**. Plaintiff's claims on behalf of the Estate arise from a January 5, 2023, incident in which Defendant Coon, a "SWAT" officer with the Metro Nashville Police Department ("MNPD"), shot and killed Mark Capps ("Capps").

## PARTIES

2. Plaintiff Tara Capps ("Mrs. Capps") is the adult surviving spouse of Mr. Mark Capps ("Capps"), who was killed by Defendant Coon in Nashville, Tennessee on January 5, 2023. Mrs. Capps brings this claim for damages on behalf of the Estate.

3. The Estate of Mark Capps ("the Estate") is the estate of Mark Capps, and is the party in interest for the benefit of which this claim is brought.

4. Defendant Metro is a government entity organized under the laws of the State of Tennessee and located in Davidson County, Tennessee.

5. Defendant Coon is an adult resident of Sumner County, Tennessee.

## JURISDICTION AND VENUE

6. This Court has federal question jurisdiction over the federal claims in this matter pursuant to 28 U.S.C. § 1331. Venue lies in this district pursuant to 28 U.S.C. § 1391(b)(2) because all claims related to this case occurred in this district.

## FACTUAL BACKGROUND

### A. Defendant Metro Exercises its Law Enforcement Function through the Metropolitan Nashville Police Department

7. Defendant Metro is a merged city-county municipal entity, with one unified government exercising governance authority over the city of Nashville and Davidson County.

8. Metro's governing charter allocates primary municipal governing authority to an elected Mayor ("the Mayor") and an elected 40-member City Council.

9. Metro's governing charter establishes the Metropolitan Nashville Police Department ("MNPD") as the exclusive law enforcement agency in Nashville – Davidson County.

10. Metro's charter establishes a Chief of Police ("the Chief") to lead MNPD, and empowers the Chief with unilateral authority, subject only to the Mayor's consent and any legal restrictions, to direct MNPD's operations, policies, training, strategy, and internal disciplinary systems and determinations.

**B. MNPD's Culture of Fear and Violence**

11. From at least 2010 until March 2017, MNPD provided each new MNPD academy recruit-trainee a 1986 book entitled "The Tactical Edge."

12. The Tactical Edge opens with the dedication that it is for "Officers who want to win."

13. The Tactical Edge continues with a picture of a white male police officer comforting another white male police officer who has just shot and killed a black man.

14. The Tactical Edge next turns to a picture of four slain white police officers, accompanied by text indicating that the officers were "wasted" because they were "careless."

15. The Tactical Edge goes on to paint a dystopian picture in which police officers will be killed in the streets by a generation raised in daycare and "violent" minorities unless police adopt the book's prescribed mental attitude and tactical approach.

16. The Tactical Edge asserts that "there is a greater capacity for violence on the street today than ever before," and that the only thing keeping officers from getting killed by citizens is that officers are now "aware of the adversary's ways and will … and more dedicated to the mental attitudes and tactical maneuvers that can defeat his violent intent."

17. The Tactical Edge continues, "THE GAP BETWEEN THE TRAINING YOU GET SPOON-FED AND WHAT YOU NEED TO SURVIVE ON THE STREET IS LEFT UP TO YOU TO FILL. That gap does not have to be very wide to make you vulnerable. Just wide enough for an offender to fire a bullet through." (Caps in original).

18. The Tactical Edge claims that "serious violent offenders" are being released from prison too quickly, and that "most convicts will be back on the streets, better schooled legally, better conditioned physically, and better equipped tactically." Accompanying this assertion are photographs of black men lifting weights in prison, plotting a prison break, and being released from prison early due to overcrowding.

19. The Tactical Edge continues, "More than half the population growth in this country in the next 20 years will come from ethnic minority groups, which have the highest ratio of law enforcement contact and are disproportionately associated with criminal violence."

20. The Tactical Edge continues, "Pre-schoolers left in day-care centers are 15 times more aggressive than other youngsters… their behavior is not just more assertive but involves physical violence, verbal abuse, and resistance to authority. The public schools, meantime, report growing numbers of a 'new kind of child' with 'different values' and profound problems that our schools are ill-equipped to handle."

21. The Tactical Edge dismisses officers who express skepticism about the book's dystopian, hyper violent worldview as "veteran hairbags."

22. The Tactical Edge's introduction closes with the statement, "On the street, you will meet the human beings, the weapons, the mentalities behind the dismal facts above. They are waiting for you. Either you or they will have the edge."

23. The Tactical Edge goes on to prescribe mental attitudes and tactics for defeating the identified "adversaries" – i.e., people of color and kids raised in daycare – and then closes with a presentation of several "model" officers.

24. One of The Tactical Edge's model officers states, "Everybody I approach, everybody I stop, every situation, I always expect the worst. That way, in case it goes down I'm ready.

If it doesn't, no big deal… at least I was covered. I maintain the attitude that the next guy might be the guy that wants to take me out, no matter what he looks like."

25. Another of <u>The Tactical Edge</u>'s model officers states, "Every shift I set a goal: I plan to make at least one in-custody arrest. If I don't make an arrest that night, I try to have two the next…. It affects my mental attitude. When I'm approaching somebody on a T-stop and looking at him as a potential arrest, it does a couple of things. One, it puts him immediately in the suspect mode. And two, it sharpens my visual awareness… I'm looking for something to arrest this guy on…. That really keeps me motivated. It makes me do more traffic stops, because if I haven't made my arrest, I have to keep contacting people until I do. I've made up to 50 and 60 stops a night. When I get an early arrest, I say, 'Okay, let's see if I can get three tonight.'"

26. Another of <u>The Tactical Edge</u>'s model officers states, "I probably am a little paranoid, but I think if you're a cop and you're not a little paranoid, you better not be a cop…. Before I go to work every day, I draw my gun out of the holster and dry-fire it 25 times in front of a mirror, so I can see what it looks like. … Some people say, '[I am] really crazy.' But let me tell you what, if I ever come to a situation where I have to do that, I'm going to know what I'm going to do." The officer continues, "When it comes down to surviving, you shouldn't be worrying about lawsuits. That's why you take preparation. You put stuff in your wife's name. You buy some additional liability insurance. You join the union so you've got a good attorney on retainer. You prepare yourself to survive a legal assault just as you do a street assault. And you fight back the same, too…. Out on that street, I'm my number one priority. My partner out there is number two. My family's number three. The department's number four. The bad guy's last."

27. The Tactical Edge closes with a picture and caption criticizing prisoners for using their recreational reading time in prison to study the law.

28. In addition to The Tactical Edge, MNPD's other training programs reinforce the message that officers should fear the citizens they encounter on a daily basis.

29. MNPD's traffic stop training materials highlight the one-in-several-million occurrence of an officer being shot during a traffic stop.

30. MNPD's traffic stop training materials also emphasize that officers should treat every citizen they pull over as a potential dangerous "felon," and instill the mantra that "there is no such thing as a routine traffic stop."

31. MNPD's training program teaches officers that in order to stay safe during encounters with citizens, the officer must be in verbal or physical control of the citizen at all times.

32. MNPD's training teaches that officers who use their firearms against citizens deemed to be lethal threats should always shoot "center mass," *i.e.* aim for the heart and lungs, and that officers should continue firing until the citizen is "neutralized."

33. MNPD's deadly force training includes a "Shoot – Don't Shoot" simulator, in which the rules state that an officer who fails to kill a citizen when the officer "should" results in the officer being virtually killed.

34. From 2015 – October 2020, MNPD officers shot and killed eight people.

35. Throughout this period, Community organizations such as Nashville Organized for Action and Hope ("NOAH") pushed for specific reforms in the way that MNPD handles mentally ill subjects experiencing acute mental health crises.

36. One of the key reforms pushed for by the community was to implement "Crisis Intervention Teams," ("CIT") utilizing a "co-response model" in which mental health counselors would respond to mental health emergencies in concert with police.

### C. Efforts to Reform MNPD

37. Several of the deaths caused by MNPD over the years have resulted in public outcry.

38. The February 2017, the MNPD killing of Mr. Jocques Clemmons triggered the creation of a grassroots movement to establish a "Community Oversight Board" ("COB") to oversee MNPD's encounters with citizens.

39. Also in 2017, government agencies such as the Metro Human Relations Commission and Department of Justice Community Relations Service recommended that MNPD reform its policies and training methods related to use of force, mental health emergencies, and review of citizen claims of civil rights violations by officers.

40. MNPD opposed the creation of a COB, and by the end of 2017 the grassroots effort to persuade the Metro Council to pass legislation creating such a body had failed.

41. In response, in 2018 the grassroots COB movement filed a citizens' petition for a referendum to establish a COB.

42. MNPD's July 2018 killing of Mr. Daniel Hambrick fueled public support for the COB movement, resulting in a landslide referendum victory for the proposal in the fall of 2018.

43. One of the chief concerns raised by the COB movement was that MNPD's internal officer investigation and disciplinary system failed to provide meaningful accountability for officer violations of citizens' civil rights, instead effectively serving to justify officers' civil rights violations with impunity.

44. With regard to the killing of Mr. Hambrick in particular, MNPD initially attempted to justify this killing. However, after reviewing the case the Davidson County Grand Jury indicted the officer who had killed Mr. Hambrick for First Degree Murder. Notwithstanding MNPD's initial attempts to justify the killing, the officer would ultimately plead guilty to Voluntary Manslaughter.

45. Mr. Hambrick's estate filed a civil claim against the officer and Metro for Mr. Hambrick's murder, which Metro ultimately settled for $2.25 million.

46. On August 14, 2020, the Mayor announced the creation of a "Policing Policy Commission," ("the Commission"), for the purpose of reviewing MNPD's use of force policies and recommending revisions to those policies.

47. In making this announcement, the Mayor stated that "The first purpose of the Commission is to identify ways for the Metro Nashville Police Department to reduce the use of force."

48. On November 20, 2020, the Mayor's office published the Policing Policy Commission Report, documenting the findings and recommendations of the Commission.

49. The Commission found several problems with MNPD's policing methods, and issued several recommended solutions to those problems.

50. One of the problems the Commission identified was that police "serve[d] as first responders to mental health and addiction crises even though police are not clinically trained to address these crises and refer individuals to appropriate services."

51. To address this problem, the Commission recommended that MNPD "Establish a co-response model to mental health crises for Nashville by creating a Crisis Intervention Team (CIT) unit in the MNPD and selecting officers interested in serving in the unit; ensure that

mental health professionals serve as co-responders and, where possible, lead interventionists."

52. The Commission also recommended that MNPD "Continue to partner with the Mobile Crisis Unit and refer to the Crisis Treatment Center operated by the Mental Health Cooperative."

53. The Commission recommended that these solutions be implemented "Immediately."

54. The Commission also found that MNPD fulfilled only four of the eight "#8cantwait[1] use of force policy requirements.

55. The four unfulfilled policy requirements were:

   a. Require de-escalation;

   b. Duty to intervene;

   c. Ban Shooting at Moving Vehicles; and

   d. Require Comprehensive Reporting.

56. The Commission recommended that MNPD's use of force policy be modified to require de-escalation, and to require that physical force be used only as the "last resort."

57. The Commission also found that MNPD needed to stop teaching "Excited Delirium" at the Police Training Academy, a controversial term that has been used to justify excessive force against mentally ill individuals.

58. To further address this problem, the Commission recommended that MNPD partner with Metro Emergency Medical Services ("EMS") and Mobile Crisis to develop protocols ensuring the safety of the individuals, the officers, the community, and the EMS providers. The Commission also specifically recommended, "If, at the scene of an incident, officers

---

[1] https://8cantwait.org/.

suspect a medical emergency, call for EMTs and trained mental health providers to assess each suspect and recommend appropriate course of action."

59. The Commission called for these reforms to be implemented "Immediately."

60. The Commission also recommended modification of MNPD's training program to "emphasize de-escalation and less use of deadly force by officers."

61. The Commission also recommended that MNPD better "Cooperate with Metro Nashville Community Oversight (MNCO)," the agency that had been established by the successful COB referendum.

62. The Commission asserted that better cooperation with MNCO would help MNPD achieve numerous important reforms, including, *inter alia*, the use of de-escalation techniques as a prerequisite to the use of force and enhanced "policies regarding agency referrals regarding mental health."

63. The Commission also made several recommendations for changes in MNPD's Use of Force policy, including a mandatory requirement that any time officer force "results in the admission to the hospital, remove officers from the line of duty and field assignments until a formal investigation has been completed."

**D. MNPD Attempts Reforms**

64. On June 21, 2021, MNPD announced a new "Partners in Care" program, a pilot project in two precincts – North and Hermitage – in which MNPD would partner with Mental Health Coop to have mental health professionals ride in patrol cars to assist with mental health emergencies.

65. On July 23, 2021, MNPD released an updated Use of Force policy incorporating some, but not all, of the Commission's recommendations.

66. MNPD's new policy required de-escalation, but failed to require that physical force be used as the "last resort."

67. MNPD continued training officers on the "Excited Delirium" concept.

68. On August 19, 2021, MNCO issued a report entitled, "Evaluation of MNPD's Use of Force Policy Revision For Consistency with Policy Recommendations."

69. MNCO's "Evaluation" found that MNPD's new policy failed to comply with the recommendations made by the Commission and MNCO in several respects, in particular failing to require that force be used only as a "last resort."

### E. MNPD "Partners in Care" Program

70. In June 2021, MNPD launched the "Partners in Care" Program, an initiative to pair mental health clinicians with specially trained "Crisis Intervention Team" officers to respond to mental health emergencies.

71. Officers participating in the Partners in Care program complete 40 hours of Crisis Intervention Team training to prepare them to work alongside master's level clinicians from Mental Health Cooperative. Each clinician who is paired with an officer receives 16 hours of job specific training to prepare them for their role in this co-response program.

72. MNPD planned a one-year pilot phase for the program, and selected the Madison and Hermitage Precincts for this initial pilot.

73. During this pilot phase, officers and clinicians responded to 1,344 calls for service that met the criteria for crisis response. Of those calls, Partners in Care units maintained a low arrest rate of just around 4%, and since the conclusion of the pilot phase, that number has steadily remained under that 4% mark. According to the data, those involved in the program are

placing a premium on connecting consumers to the appropriate care and diverting them out of the criminal justice system and into the mental health care system.

74. After the initial Partners in Care pilot phase concluded, Metro decided to continue the program. Metro's public statement indicated that MNPD's "Office of Alternative Policing Strategies" was relying on data provided by Department of Public Health epidemiologists to plan the program's expansion to each of the MNPD's eight precincts.

75. In the meantime, on January 27, 2022 MNPD officers shot and killed a Mr. Brandon Eastep on the shoulder of I-65, while Mr. Eastep was experiencing a mental health crisis.

76. Mr. Eastep had a documented history of domestic violence, substance abuse, and mental health crises.

77. The encounter began with an officer finding Eastep on the shoulder of I-65, loitering in the side of the highway for no apparent reason. The officer stopped to talk to Eastep, and the situation quickly developed into a crisis when Eastep pulled out a box cutter and then tried to run away.

78. Backup officers arrived, and the MNPD officers ended up in a thirty-minute standoff with Eastep. MNPD did not utilize the services of any mental health clinicians or deploy any CIT-trained officers to help resolve Eastep's mental health crisis.

79. Eastep eventually pulled a metal cylindrical object out and pointed it at the officers, as if it was a weapon. The officers responded by shooting Eastep twelve times, killing him.

80. The Eastep shooting sparked widespread community outcry. In the wake of the shooting, Nashville's Mayor publicly stated, "Like many Nashvillians, I was disturbed by the

shooting death of Landon Eastep." The Tennessean reported that leaders and advocates across the city voiced the message, "This never should have happened."[2]

81. In May 2022, MNPD expanded Partners in Care to the Central Precinct; in November 2022, MNPD expanded it to the South Precinct.

82. In January 2023, Mental Health Coop's Senior Vice President of Public Relations and Community Development, Amanda Bracht, gave the following statement to media regarding Partners in Care's role in responding to mental health emergencies, specifically referencing the Eastep killing: "Every situation is unique, and of course the I-65 situation is incredibly tragic with the outcome," Bracht said. "But we have had similar situations where individuals have been threatening themselves and potentially threatening others and had a weapon, or a weapon close by, and we've been able to de-escalate and get those people connected to care."[3]

### F. Mark Capps

83. Mr. Mark Capps was a Grammy award winning audio engineer who lived in Nashville, Tennessee until his untimely death at the hands of Defendants on January 5, 2023. Capps was 54 years old at the time that Defendant Coon shot and killed him.

84. Capps produced music in numerous genres for many famous artists over the course of his career, and won the Grammy for "Best Polka Album" for the years 2005, 2006, 2007, and 2008. Capps was well known and respected within the industry for his work. Capps's credit list includes Alabama, Brooks & Dunn, Chris Young, Aaron Tippin, Conway Twitty, Joe Diffie, the Oak Ridge Boys, Big & Rich, John Michael Montgomery, Kenny Rogers,

---

2    https://www.tennessean.com/story/news/local/davidson/2022/09/16/i-65-police-shooting-nashville-timeline-landon-eastep-death/69494680007/.
3    https://www.wkrn.com/news/local-news/nashville/a-year-after-i-65-shooting-how-police-mental-health-teams-are-de-escalating-crises/.

The Chicks, Neil Diamond, Amy Grant, Michael W. Smith, the Gaither Vocal Band, Barry Manilow, Donna Summer, the Mavericks, Anita Cochran, Kenny Loggins, and Olivia Newton-John.

85. Capps had been married to Plaintiff Tara Capps ("Mrs. Capps") since 2016, and had become close with her adult daughter, Capps's stepdaughter Mollie Acuff ("Acuff").

86. In late 2022 and early 2023, Ms. Acuff was living with the Capps's while she prepared to go to school in Seattle. Ms. Acuff's boyfriend, Tennessee Bureau of Investigation ("TBI") officer Zachery Noah Silva ("Silva"), was also living with the Capps's.

87. Capps also had his own adult daughter, Summer Capps.

88. Capps also suffered from chronic depression, as well as substance abuse issues.

89. On January 3, 2023, Capps's brother, Jeff Capps, died. Jeff's death exacerbated Capps's depression, and over the course of the next two days Capps spiraled into grief.

### G. January 4th and 5th, 2023: Capps in Crisis

90. During the evening of January 4, 2023 and into the early hours of January 5, 2023, Capps experienced an acute mental health and substance abuse episode at his home.

91. Mrs. Capps, Ms. Acuff, and Silva were at the house during this crisis. No one was physically hurt while Capps spiraled downward, but Capps did numerous things that were very frightening for Mrs. Capps, Ms. Acuff, and Silva.

92. At about 6 AM, after Capps and Mrs. Capps had retired to their bedroom, Silva snuck out of the house and went to work at the TBI. Silva did not contact MNPD, the TBI, or any other law enforcement agency to report Capps's behavior to anyone.

93. Capps passed out at about 10 AM, and Mrs. Capps and Ms. Acuff then went to MNPD's Hermitage Precinct.

94. There, Mrs. Capps and Ms. Acuff met with MNPD Officer Patrick Lancaster ("Lancaster") and another officer.

95. Mrs. Capps and Ms. Acuff reported to Lancaster and the other officer that Capps was severely depressed and had been using alcohol and prescription medications. They reported that Capps had woken them up at 3 AM, that he was intoxicated, and that he threatened them with a handgun. Mrs. Capps and Ms. Acuff also reported that Capps had attempted to coerce Mrs. Capps into confessing that she had been unfaithful to him, and said that Capps had refused to allow them to leave.

96. Mrs. Capps reported that she and Capps went to their room at about 6 AM, ostensibly planning to go to sleep. However, Mrs. Capps reported that instead of going to sleep Capps had spent about three hours drinking alcohol and taking medications.

97. Mrs. Capps and Ms. Acuff reported that while Capps and Mrs. Capps were in their room, Ms. Acuff and Silva had quietly gotten Silva ready for work. Silva had then left, and gone to work early that morning without reporting the situation to MNPD or the TBI.

98. Mrs. Capps and Ms. Acuff reported that at approximately 10 AM Capps had finally passed out, after which Mrs. Capps and Ms. Acuff went to the Hermitage Precinct to report the incident. Mrs. Capps and Ms. Acuff asked to press charges for the incident, and requested an order of protection.

99. After interviewing Mrs. Capps and Ms. Acuff, Lancaster met with his chain of command to report what he had been told and seek further direction. Lancaster identified Capps to his superiors as "Mark Cupps," apparently having no idea who Capps was.

100. Lancaster advised his superiors that "Cupps" was suffering from severe depression, had consumed prescription medications and alcohol, had made "suicide by cop"

statements, and had ultimately passed out. Lancaster stated that Capps was believed to still be passed out. Lancaster further advised that Mrs. Capps and Ms. Acuff wanted to file criminal charges and seek an order of protection.

101.     Lancaster's superiors directed him to refer the matter to MNPD's Domestic Violence Unit for a determination regarding how to proceed. Lancaster then called MNPD's Domestic Violence ("DV") unit on the phone.

102.     The DV official that Lancaster initially spoke with advised him to just take Capps into custody without first swearing out warrants. The DV official expressed concern that delaying to get warrants could result in Capps leaving the residence. Lancaster said, "If we do that I'd rather go than stay here, and let somebody else sit here with them." Lancaster then suggested that he could, "Go knock on the door." Nothing in Lancaster's statements or tone indicated any fear that going to Capps's house to take him into custody would expose Lancaster to a likelihood of being injured or killed.

103.     Lancaster then spoke with Mrs. Capps and Ms. Acuff again, asking if it was typical for Capps to be remorseful and calm down after waking up from passing out. Ms. Acuff confirmed that Capps typically woke up calmer. Mrs. Capps then explained that Capps was also diabetic, and that he would routinely wake up briefly to eat and then go back to sleep. Mrs. Capps and Ms. Acuff then told Lancaster that Capps had taken "Ambien," a sedative, that morning.

104.     Mrs. Capps asked if MNPD would shoot Capps if he were to pull a gun when they came to the house. Lancaster responded, "It doesn't happen like that… in the last couple months I've had at least two people want to commit suicide by cop and both of them lived and both of them went to jail."

105.    Lancaster continued discussing the situation with superiors, who informed him that DV's idea of taking Capps into custody without a warrant was being overridden. Instead, Lancaster was directed to obtain warrants and then allow other units to serve them.

106.    Lancaster then swore out warrants against Capps for two charges of Aggravated Assault and two charges of Aggravated Kidnapping, naming Mrs. Capps and Ms. Acuff as the victims in each set of charges.

107.    In the meantime, MNPD had already put undercover surveillance officers in place outside the Capps home. Over the course of the next few hours these officers reported that Capps was home, his car was in the driveway, and they observed him walk outside unarmed to both the front driveway and back porch before returning to the house.

### H.    MNPD Deploys "SWAT" to Serve the Warrants

108.    After Lancaster swore out the warrants, MNPD dispatched a 13-officer "SWAT" team to serve the warrants on Capps at home.

109.    Although Hermitage Precinct was one of the original Partners in Care pilot precincts, and its program had been operational for well over a year, MNPD did not involve Partners in Care in the warrant service attempt.

110.    Rather, the team included SWAT units under the premise that Capps was to be treated as a "barricaded" suspect, even though Capps was not actually barricaded.

111.    Even though MNPD had Capps's cell phone number, MNPD SWAT Sgt. Jonathan Frost decided that rather than attempt to call Capps to talk it out, the two SWAT teams would begin the operation by setting breaching charges on both the front and back doors.

112.    Ostensibly, MNPD's plan was for the two SWAT teams to withdraw to cover after setting the breaching charges and then attempt to talk to Capps. However, the SWAT team would end up killing Capps without ever attempting dialogue.

113.    Defendant Coon, along with fellow SWAT team members Jason Rader and Tim Brewer, were assigned as the front side breaching team.

114.    After parking their vehicles on Capps's street, Coon, Rader and Brewer gathered up. Within seconds of Brewer's arrival, the team walked swiftly up to Capps's porch to begin setting the breaching charges.

115.    In the meantime, MNPD's back side breaching team cut a hole through Capps's wooden privacy fence, entered Capps's back yard, and went up on onto the back deck to set the breaching charges on the back door.

116.    On the front side of the house, Coon held his Colt M4 Carbine assault rifle ready in his hands as he, Rader, and Brewer ran up onto Capps's porch.

117.    Coon then kept his assault rifle pointed at Capps's door, ready to shoot while Rader began setting the breaching charges on Capps's front door.

118.    Capps's front door opened slightly, to which Coon instantly responded by yelling, "Show me your hands!!"

119.    Rader immediately chimed in, "Show me your hands!"

120.    In response, the door opened just a bit further.

121.    Coon again started to yell, "Show me your hands!", but then interrupted his own command by firing his assault rifle four times at Capps, shattering Capps's storm door in the process.

122.     At the time that Coon began firing, only two seconds had elapsed since the door had first opened.  On information and belief, Capps was not pointing a gun at them or taking any other action that posed an imminent threat of harm.

123.     Coon hit Capps with three out of four shots, all of which struck Capps in the chest.

124.     Capps's door swung closed as Capps collapsed onto the floor, his head falling toward the right[4] while his feet landed on the left.

125.     Coon and Rader continued yelling "Show me your hands!" while Coon pushed Capps's interior door the rest of the way open.

126.     The officers entered Capps's home, finding Capps lying on the floor.

127.     Coon headed immediately to an adjoining office that was adjacent to the Capps's entryway, without stopping to inspect or secure Capps.

128.     The SWAT members tied Capps's hands and dragged him out of the house.  The SWAT officers did not find a gun Capps's hands, in his clothing, or on his body, and said absolutely nothing about a gun while they were restraining and moving him.

129.     The only gun found near Capps, a pistol, was tucked halfway under a rug on the other side of the entryway from him, several feet away.

130.     Based on the information they had received, the MNPD team had no reason to believe that anyone else was in the house. Nonetheless, the SWAT team searched Capps's entire house, setting off several "flashbangs" as they did so which caused additional damage to the Capps's house.

131.     Emergency medical responders arrived at the scene and attempted to resuscitate Capps, but it were too late.  At 2:22 P.M., EMS pronounced Capps dead in his yard.

---

[4] Right side from the perspective of the front yard.

## I. TBI Investigation and MNPD Administrative Review

132.     Within hours of the killing, MNPD spokesperson Don Aaron went on local television to justify the shooting.

133.     Meanwhile, pursuant to an agreement reached in 2017 between Metro and the TBI, the TBI was dispatched to investigate the Capps shooting.

134.     The TBI interviewed Coon, Rader, and Brewer as part of this investigation.

135.     The teammates all claimed in their TBI interviews that Capps had been pointing a gun directly at them when Coon shot him, and that Capps had refused to put the gun down. However, none of the footage from the team's body cameras corroborated their claim.

136.     Coon actually went so far as to claim that he could see Capps's finger on the trigger. To explain away the fact that he shouted "Show me your hands" when Capps was supposedly pointing a gun at his team, Coon claimed that he said that because it was just his "natural response."

137.     Rader told the TBI that he had said "Let me see your hands"[5] because Coon said it, and that Rader was just repeating Coon.

138.     Brewer said that he did not know why Coon said "Show me your hands," and explained it away by saying that it was maybe the first thing that came to Coon's mind.

139.     On information and belief, the SWAT team concocted this story after the fact in order to justify having killed Capps.

140.     Based on the claim that Capps was pointing a gun at the SWAT team when Coon shot him, the District Attorney's Office declined to seek prosecution in the case.

---

[5] Although the body camera audio is a little difficult to understand, it appears that Rader actually said "Show me your hands" not "Let me see your hands."

141.    Pursuant to the 2017 Memorandum of Understanding between MNPD and the TBI, MNPD retained the right to conduct its own interviews of its officers in order to effectuate MNPD's internal use of force review and administrative investigation.

142.    However, MNPD instead found that the Capps shooting was justified without conducting any of its own interviews of its employees.

## CLAIMS FOR RELIEF

### COUNT I: EXCESSIVE FORCE IN
### VIOLATION OF THE FOURTH AMENDMENT
### (42 U.S.C § 1983)

**(ALL DEFENDANTS)**

143.    Plaintiff hereby reincorporates paragraphs 1 – 142 by reference.

144.    On January 5, 2023, Defendant Coon used excessive, unreasonable force by shooting and killing Capps when he was not posing an active threat of imminent harm.

145.    Defendant Coon was acting under color of state law when he gunned down and killed Capps.

146.    Defendant Metro caused Coon to kill Capps by:

   a. Engendering an MNPD officer culture of fear, violence, and impunity;

   b. Disregarding the evidence that MNPD's internal disciplinary system treated officer violations of civil rights with impunity.

   c. Failing to adequately reform MNPD's use of force and mental health emergency policies on the heels of unlawful officer-involved shootings and calls for policy reform by community grassroots organizations and myriad government agencies.

   d. Allowing its staff to disregard the reforms that MNPD had put into place to ostensibly prevent mental-health related police shootings.

e. Failing to adequately train and prepare Defendant Coon to handle a situation like the one that led him to kill Capps.

147. Defendant Coon acted deliberately, intentionally and with reckless disregard for Capps's civil rights by shooting him in the absence of an immediate threat.

148. The Estate is entitled to compensation for the physical, legal, emotional, constitutional, and financial harm that Capps suffered by being gunned down and killed.

## REQUEST FOR RELIEF

WHEREFORE, these premises considered, Plaintiff prays:

1. That the Defendants Answer this Complaint within the time provided by law.

2. That this cause be tried by a jury.

3. That judgment for the Estate enter against the Defendants on each count.

4. That the Estate be awarded nominal damages on all counts.

5. That the Estate be awarded compensatory damages in an amount determined by the jury.

6. That the Estate be awarded punitive damages in an amount to be determined by the jury.

7. That Plaintiff be awarded her attorney's fees and reasonable litigation expenses, including expert witness fees, pursuant to 42 U.S.C. § 1988 and F.R. Civ. Pro. 54(d).

8. That the court costs in this matter be taxed to Defendants.

9. That the Estate be awarded pre- and post-judgment interest against Defendants.

10. That the Estate be awarded all other relief to which it may appear it is entitled in the interests of justice.

**Respectfully submitted**,

*s/ Kyle Mothershead*
Kyle Mothershead, BPR 22953
Relentless Advocacy, PLLC
2901 Dobbs Ave.
Nashville, TN 37211
T: (615) 429-4717 / F: (615) 229-6387
E: kyle@relentlesslaw.com

*/s Bryan Moseley*
Bryan Moseley, BPR 021236
Moseley & Moseley, Attorneys at Law
237 Castlewood Drive, Suite D
Murfreesboro, TN 37129
T: (615) 254-0140 / F: (615) 634-5090
E: bryan.moseley@moseleylawfirm.com