## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | |
|---|---|
| TARA CAPPS, as administrator of the Estate of MARK CAPPS,<br><br>    Plaintiff,<br><br>v.<br><br>METROPOLITAN GOVERNMENT OF NASHVILLE-DAVIDSON COUNTY, TENNESSEE, et al.,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)    No. 3:23-cv-01141<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

## <u>MEMORANDUM OPINION</u>

This case involves the unfortunate death of Mark Capps ("Mr. Capps").  On January 5, 2023, Mr. Capps was shot and killed by Officer Ashley Coon ("Officer Coon") while Officer Coon and others executed warrants for Mr. Capps's arrest.[1]  Tara Capps ("Mrs. Capps"), as the administrator of her husband's estate, brings suit against the Metropolitan Government of Nashville-Davidson County, Tennessee ("Metro") and Officer Coon, in his individual capacity (collectively, "Defendants").  She invokes 42 U.S.C. § 1983 ("§ 1983") for Defendants' use of excessive force in violation of Mr. Capps's Fourth Amendment rights.  (Doc. No. 50).  Before the Court is Officer Coon's Motion for Summary Judgment (Doc. No. 58), which has been briefed and is ripe for review (Doc. Nos. 58, 59, 66, 74, 93).  For the following reasons, Officer Coon's motion will be granted, and the claim against him will be dismissed.

---

[1] At the time of the events that led to the instant suit, Sergeant Coon's rank was Police Officer II. (Doc. No. 59 at 1 n.1).  To maintain consistency with the evidence in the record, the Court will refer to Sergeant Coon as Officer Coon for the purposes of resolving this motion.

## I.   BACKGROUND AND UNDISPUTED FACTS[2]

On January 5, 2023, Metropolitan Nashville Police Department ("MNPD") Officer Patrick Lancaster ("Officer Lancaster") swore out warrants for Mr. Capps's arrest.  (Doc. No. 67 ¶ 1). Officer Lancaster alleged one count of aggravated assault and one count of aggravated kidnapping to Mrs. Capps and one count of aggravated assault and one count of aggravated kidnapping to Mollie Acuff ("Ms. Acuff"), Mrs. Capps's daughter.  (Doc. No. 60-2; Doc. No. 67 ¶ 1).  Special Response Team ("SRT") officers Coon, Jason Rader ("Officer Rader") and Timothy Brewer ("Officer Brewer") (collectively, "Officers") were assigned to execute the arrest warrants on Mr. Capps at his home at 128 Summit Run Place in Hermitage, Tennessee.  (Doc. No. 60-2; Doc. No. 67 ¶¶ 1-3).  To prepare to serve the arrest warrants on Mr. Capps, Officer Coon was assigned to cover Officers Rader and Brewer as they placed a breaching charge on Mr. Capps's front door. (Doc. No. 67 ¶ 2).  Prior to executing the warrants, the Officers were briefed that Mr. Capps had held multiple individuals at gunpoint, threatened them, had access to firearms, and threatened to shoot responding police officers.  (Id. ¶ 3; Doc. No. 60-4 at 44:16–46:23, 50:4–20; Doc. No. 60-6 at 21:8–22:4).

The Officers' body camera footage captured the three minutes in which the events leading to the instant suit occurred.  That afternoon, the Officers drove toward Mr. Capps's home, parked on his street, and exited their police cruisers. (Doc. No. 60-7 at 14:08:09; Doc. No. 60-9 at 14:09:03).  After roughly two minutes of surveilling the street and preparing to serve the warrants, the Officers moved closer to Mr. Capps's front door.  (Doc. No. 60-7 at 14:10:00).  Officer Coon

---

[2] The undisputed facts in this section are drawn from the undisputed portions of the parties' statements of facts (Doc. Nos. 67, 75), the exhibits, depositions, and declarations submitted in connection with the summary judgment briefing, and portions of the Second Amended Complaint ("Complaint") (Doc. No. 50) that are not contradicted by the evidence in the record.

approached Mr. Capps's front door with his gun drawn to the left of Officers Brewer and Rader (id. at 14:10:31), while Officer Rader crouched down to place the charge on the right side of Mr. Capps's door.  (Id. at 14:10:45).  Officer Brewer stood behind Officer Rader.  (Doc. No. 60-5 at 52:9–16; Doc. No. 60-8 at 14:10:45).

Seconds later, Mr. Capps opened his front door.  (Doc. No. 60-7 at 14:10:45).  None of the body camera footage shows Mr. Capps's hands at the time he opened the door.  (Doc. No. 60-7 at 14:10:46; Doc. No. 60-8 at 14:10:49; Doc. No. 60-9 at 14:09:55).  Within seconds of Mr. Capps opening the door, Officer Coon immediately shouted: "Show me your hands!"  (Doc. No. 60-7 at 14:10:46).  Officer Brewer continued to hold breaching tape over his head.  (Doc. No. 60-8 at 14:10:48).  Officer Coon repeated: "Show me . . .," and proceeded to fire four shots into Mr. Capps's home.  (Doc. No. 60-7 at 14:10:47).  The footage is unclear on whether Mr. Capps turned from the Officers before Officer Coon shot him.  (Id.).  Officers Rader and Brewer grabbed their firearms after Officer Coon shot Mr. Capps.  (See Doc. No. 60-8 at 14:10:50; Doc. No. 60:9 at 14:09:53).

After firing into the home, Officer Coon opened the front door, and again yelled: "Show me your hands!"  (Doc. No. 60-7 at 14:10:54).  Officer Brewer yelled the same immediately after Officer Coon did.  (Id. at 14:10:55).  Officer Coon then said to one of his fellow officers: "Give me a squeeze," and entered the house.  (Id. at 14:10:59).  As Officer Coon walked into Mr. Capps's home, he again instructed: "Hands!"  (Id. at 14:11:03).  Officer Coon walked forward and to the right, proceeding to search Mr. Capps's home.  (Id. at 14:11:04).  Officers Brewer and Rader proceeded straight forward into the home, with their guns drawn.  (Doc. No. 60-8 at 14:11:06).  Officer Brewer then turned back toward Mr. Capps's front door, checked Mr. Capps's pulse, and placed his hands in zip ties.  (Id. at 14:11:20).  Officer Coon instructed: "Pistol should be right

there.  It was in his right hand.  It should be a black revolver."  (Doc. No. 60-7 at 14:11:25).  Next to Mr. Capps's right foot sat a black revolver under a desk, on Mr. Capps's right side and near where he was shot.  (Doc. No. 60-8 at 14:12:31; Doc. No. 67 ¶ 9; Doc. No. 60-11).

After surveying the scene, Officer Jarvis's body worn camera ("BWC") captured Officer Rader's accounting of the event.  (Doc. No. 66-F).[3]  On the BWC, an unidentified officer asked "[a]re all of our guys good?"  (Id. at 0:15).  Officer Rader responded: "I was placing the charge on the door, and I remember being down here, placed the charge on the door."  (Id. at 0:14–10).  While explaining, Officer Rader crouched down imitating putting the charge on Mr. Capps's door.  (Id.).  Officer Rader continued: "He opened it, I looked up, and he was holding a gun like this.  Pointed right at Kendall."[4]  (Id. at 0:09–04).  While describing this, Officer Rader imitated Mr. Capps holding a gun at waist height, pointed toward Officer Coon.  (Id.).  Officer Rader finished: "And that's how it all kicked off."  (Id. at 0:02–01).

## II.    LEGAL STANDARD

Summary judgment is appropriate only where there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A genuine dispute of material fact exists 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'"  Peffer v. Stephens, 880 F.3d 256, 262 (6th Cir. 2018) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986)).  "The party bringing the summary judgment motion has the initial burden of informing the Court of the basis for its motion and

---

[3] Exhibits D, F, and N to Mrs. Capps's Response to Officer Coon's Motion (Doc. No. 66) have been manually filed with the Court, and so do not have docket numbers.  When referencing these materials, the Court will refer to the docket number they were filed as pertaining to (Doc. No. 66), followed by the exhibit letter.

[4] Officer Coon often goes by "Kendall," his middle name.  (Doc. No. 66 at 4 n.3, Doc. No. 75 ¶ 46).

4

identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003) (internal citation omitted). "The moving party may satisfy this burden by presenting affirmative evidence that negates an element of the non-moving party's claim or by demonstrating an absence of evidence to support the non-moving party's case." Id. (internal citation and quotation marks omitted). "In response, the nonmoving party must present 'significant probative evidence' that will reveal that there is more than 'some metaphysical doubt as to the material facts.'" Miller v. Maddox, 866 F.3d 386, 389 (6th Cir. 2017) (quoting Moore v. Philip Morris Cos., Inc., 8 F.3d 335, 340 (6th Cir. 1993)).

In deciding a motion for summary judgment, the Court must review all the evidence, facts, and inferences in the light most favorable to the party opposing the motion. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (internal citation omitted). The Court does not, however, weigh the evidence, judge the credibility of witnesses, or determine the truth of the matter. See Anderson, 477 U.S. at 249. The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient to survive summary judgment; rather, there must be evidence on which a trier of fact could reasonably find for the non-moving party. See Rodgers, 344 F.3d at 595.

## III. ANALYSIS

Mrs. Capps brings her claim under § 1983, "which provides for the vindication of federal rights." Green v. Throckmorton, 681 F.3d 853, 859–60 (6th Cir. 2012). To survive summary judgment in a § 1983 action, Mrs. Capps must demonstrate a genuine issue of material fact "that a person acting under color of state law deprived [Mr. Capps] of a right secured by the Constitution or laws of the United States." Id. (quoting Waters v. City of Morristown, Tenn., 242 F.3d 353, 358–59 (6th Cir. 2001)); Wurzelbacher v. Jones-Kelley, 675 F.3d 580, 583 (6th Cir. 2012). Mrs. Capps asserts that Officer Coon—clearly a "person acting under color of state law"—violated her

5

husband's Fourth Amendment rights by using unreasonable deadly force during Mr. Capps's seizure.

Having properly identified Mrs. Capps's Fourth Amendment claim, the Court turns to Officer Coon's assertion that he is entitled to summary judgment on the basis of qualified immunity. Officer Coon contends he is entitled to qualified immunity on Mrs. Capps's Fourth Amendment claim because: (1) there is no genuine dispute of material fact that Officer Coon's use of force against Mr. Capps was objectively reasonable; and (2) there is no clearly established law that barred him from using deadly force in this circumstance. (Doc. No. 59 at 9, 22). Mrs. Capps fails to appreciate the difference between these two arguments. (Doc. No. 66 at 8). Instead, she responds to both arguments together. (Id. at 6, 8). Nevertheless, the Court will address Officer Coon's arguments separately.

Viewing all evidence in the record in Mrs. Capps's favor, the Court must determine whether Officer Coon's qualified immunity defense contains a genuine dispute on any material fact such that the jury must weigh the evidence at trial. Fed. R. Civ. P. 56(a). "Qualified immunity, if it applies, is a defense not just against liability, but against suit itself." Johnson v. Moseley, 790 F.3d 649, 653 (6th Cir. 2015) (internal citation omitted). Because Officer Coon has raised the qualified immunity defense, Mrs. Capps bears the burden of showing Officer Coon is not entitled to qualified immunity here. Reilly v. Vadlamudi, 680 F.3d 617, 623 (6th Cir. 2012). In doing so, Mrs. Capps must satisfy both steps of the qualified immunity inquiry, that: (1) Officer Coon violated a "constitutional right" of Mr. Capps's and (2) the constitutional right was "clearly established." Saucier v. Katz, 533 U.S. 194, 201 (2001); Crawford v. Tilley, 15 F.4th 752, 762 (6th Cir. 2021).

6

1. Prong 1: Whether Officer Coon Violated Mr. Capps's Constitutional Rights

Mrs. Capps alleges that Officer Coon exerted excessive force on Mr. Capps when he used deadly force on Mr. Capps during his arrest on January 5, 2023. The parties agree that the federal right at issue here is Mr. Capps's right, under the Fourth Amendment, to be free from excessive force during an authorized arrest. See King v. Taylor, 694 F.3d 650, 662 (6th Cir. 2012). To successfully establish her excessive force Fourth Amendment claim, Mrs. Capps must establish that Officer Coon: "(1) actively participated in the use of excessive force, (2) supervised the officer who used the excessive force, or (3) owed the victim a duty of protection against the use of excessive force." Turner v. Scott, 119 F.3d 425, 429 (6th Cir. 1997) (citing Durham v. Nu'Man, 97 F.3d 862, 866 (6th Cir. 1996), cert. denied sub nom.). While the parties do not argue which method of excessive force applies here, the first option, Officer Coon's alleged active participation in the use of excessive force against Mr. Capps, is the only method that is applicable.

It is undisputed that Officer Coon "seized" Mr. Capps by shooting him. Given this, whether Mrs. Capps can establish that Officer Coon used excessive force on Mr. Capps is subject to the Fourth Amendment's "reasonableness" requirement. See King, 694 F.3d at 662 (reasonableness requirement triggered where an officer shot an individual pointing a gun at him and other officers); see also Tennessee v. Garner, 471 U.S. 1, 7 (1985) ("[T]here can be no question that apprehension by the use of deadly force is a seizure subject to the reasonableness requirement of the Fourth Amendment."). "Determining whether the force used to effect a particular seizure is reasonable under the Fourth Amendment requires a careful balancing of the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. 386, 396 (1989). In the case of the use of deadly force, as occurred here, the reasonableness of that force depends upon whether "the officer ha[d] probable cause to believe that the suspect pose[d] a threat of serious physical harm,

7

either to the officer or to others." Garner, 471 U.S. at 11 ("[I]f the suspect threatens the officer with a weapon or there is probable cause to believe that he has committed a crime involving the infliction or threatened infliction of serious physical harm, deadly force may be used if necessary[.]"). This inquiry "requires careful attention to the facts and circumstances of each particular case, including [(1)] the severity of the crime at issue, [(2)] whether the suspect poses an immediate threat to the safety of the officers or others, and [(3)] whether he is actively resisting arrest or attempting to evade arrest by flight." Id. (internal citation omitted). These factors are non-exclusive. Jacobs v. Alam, 915 F.3d 1028, 1040 (6th Cir. 2019) (internal citation and quotations omitted).

Ultimately, the "reasonableness" of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Graham, 490 U.S. at 396 (internal citation omitted). The reasonableness calculus "must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id. at 396–97. Still, "the 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." Id. at 397 (internal citation omitted).

A. Relevant Facts

To properly evaluate whether Officer Coon's use of deadly force was objectively reasonable, the Court must first "determine the relevant set of facts." Scott v. Harris, 550 U.S. 372, 378 (2007). In qualified immunity cases at this stage of proceedings, this "usually means adopting. . .the plaintiff's version of the facts." Id. However, when there is in "existence in the record [] a videotape capturing the events in question[,]" and there are "no allegations or

8

indications that th[e] videotape was doctored or altered in any way, nor any contention that what it depicts differs from what actually happened," the Court should rely on "the facts in the light depicted by the videotape." Id. at 378–82.

Mrs. Capps does not contest the events as seen on the Officers' body camera footage, but does not believe it tells the complete story. In fact, Mrs. Capps relies on the footage extensively in her responsive briefing. (Doc. No. 66 at 2–3). Accordingly, the Court will rely on the Officers' body camera footage, drawing "all reasonable inferences in favor" of Mrs. Capps "*to the extent supportable by the record*" to determine whether Mr. Capps's actions rose to "a level warranting deadly force."[5] Scott, 550 U.S. at 381 n.8. This this determination is ultimately a "pure question of law."[6] Id.

## B. Reasonableness Analysis

The Court turns to the merits of Officer Coon's contention that his use of force was objectively reasonable. Officer Coon contends he is entitled to summary judgment because the undisputed facts show that he was serving arrest warrants for violent crimes against a suspect that pointed a gun at him and his teammates, making his use of deadly force reasonable. (Doc. No. 59 at 11–12). Mrs. Capps disagrees. She contends that there is at least a genuine dispute of material fact on whether Mr. Capps subjected Officer Coon to imminent harm. (Doc. No. 66 at 7–8). The

---

[5] To the extent Officer Coon relies on Officer Lancaster's interview with Mrs. Capps and Ms. Acuff (Doc. No. 59 at 3), and Mrs. Capps relies on Mr. Capps's actions prior to the Officers' arrival at his house (Doc. No. 66 at 1), the record is silent on whether these events were known to Officer Coon at the time of his use of force and are therefore irrelevant to the Court's analysis here. Bouggess v. Mattingly, 483 F.3d 886, 890 n.4 (6th Cir. 2007) ("It is axiomatic that, because we make a probable cause inquiry, we must focus on the facts the officer knew at the time.").

[6] While the determination on the reasonableness of Officer Coon's use of force is one of law, there may be genuine fact issues impacting that analysis that are best resolved by a jury, such as whether Mr. Capps "posed a serious and immediate threat of harm." Chappell v. City of Cleveland, 585 F.3d 901, 909 (6th Cir. 2009).

Court agrees with Officer Coon that there is no genuine dispute of material fact that his use of deadly force on Mr. Capps was objectively reasonable such that he did not violate Mr. Capps's Fourth Amendment rights.

Viewing all of the evidence in Mrs. Capps's favor, the focus here is on the threat factor. The two other factors weigh in Mrs. Capps's favor. On the first factor, the severity of the crime, Officer Coon argues that he was at Mr. Capps's home to arrest him for aggravated assault and aggravated kidnapping, both violent crimes (Doc. No. 60-2; Doc. No. 67 ¶ 2). See Gambrel v. Knox Cnty., Kentucky., 25 F.4th 391, 402 (6th Cir. 2022) ("The Officers had probable cause to believe that [the suspect] had kidnapped his daughter, no doubt a serious felony."); Bell v. Cumberland Cnty., 665 F. App'x 421, 426 (6th Cir. 2016) ("[W]hile [the suspect] was merely trespassing when Deputy Human first arrived, the unprovoked aggravated assault that he subsequently unleashed undoubtedly entitled Deputy Human to protect himself."). This is undisputed. (Doc. No. 67 ¶ 2). However, the body camera footage plainly shows Mr. Capps at his home, alone, at the time these events took place. (Doc. No. 60-7 at 14:10:46). Unlike in Gambrel and Bell, the footage demonstrates that Mr. Capps was not committing a crime at the time of the use of deadly force. On the third factor, whether Mr. Capps resisted arrest or fled, the result is the same. Because Officer Coon used deadly force so quickly on Mr. Capps after Mr. Capps opened the door, this Court did not see any behavior that Mr. Capps was actively trying to evade arrest. (See id. at 14:10:45–47 (firing roughly two seconds after Mr. Capps opened his door)). The Court views that ambiguity in Mrs. Capps's favor. Scott, 550 U.S. at 381 n.8. Accordingly, the Court will focus on whether Officer Coon can establish the "minimum requirement" of "threat of severe physical harm." Mullins v. Cyranek, 805 F.3d 760, 766 (6th Cir. 2012).

"In excessive force cases, the threat factor is 'a *minimum* requirement for the use of deadly force,' meaning deadly force 'may be used only if the officer has probable cause to believe that the suspect poses a threat of severe physical harm.'" <u>Mullins</u>, 805 F.3d at 766 (quoting <u>Untalan v. City of Lorain</u>, 430 F.3d 312, 314 (6th Cir. 2005)). While "[a] suspect need not be armed to pose an imminent threat to an officer's safety," <u>Mitchell v. Schlabach</u>, 864 F.3d 416, 422–23 (6th Cir. 2017), "merely possessing a weapon is not enough." <u>Jacobs</u>, 915 F.3d at 1401. Rather, "the officer must reasonably believe the individual poses a danger of serious physical harm to himself or others to justify deadly force." <u>Bouggess</u>, 482 F.3d at 896; <u>see also</u> <u>Dickerson v. McClellan</u>, 101 F.3d 1151, 1154–55, 1163 (6th Cir. 1996). Ultimately, "whether the use of deadly force at a particular moment is reasonable depends primarily on [an] objective assessment of the danger a suspect poses at that moment. The assessment must be made from the perspective of a reasonable officer in the defendant's position." <u>Bouggess</u>, 482 F.3d at 889.

Here, Officer Coon had probable cause to believe that Mr. Capps posed an immediate threat to himself and his fellow officers when he used deadly force. True, none of the body camera footage shows Mr. Capps's hands when he opened his front door. (Doc. No. 60-7 at 14:10:46; Doc. No. 60-8 at 14:10:49; Doc. No. 60-9 at 14:09:55). However, the undisputed facts demonstrate that when Mr. Capps opened his front door just a few feet from the Officers, he had a gun pointed at a ninety-degree angle toward them.

Starting with the Officers' interviews with the Tennessee Bureau of Investigation ("TBI"), Officers Coon, Rader, and Brewer informed TBI that Mr. Capps pointed at gun at them when he opened his front door, which they believed he would use. (<u>See</u> Doc. No. 66-6 at 2 (Officer Coon stated that he "saw the handgun and it was pointed directly at him and the other two officers," that Mr. Capps had "a finger on the trigger," and Officer Coon "believed that [Mr. Capps] was going

to shoot him and his partners."); Doc. No. 66-7 at 1 (Officer Rader stated that he "looked up, [and] he saw the revolver. . . and that it was pointed at him" and that he "had made up his mind that he would have to shoot this guy because he was pointing a gun."); Doc. No. 60-8 at 2 (Officer Brewer stated that he saw a "large black revolver coming from around the door" that "was pointed at them" and "felt like they were still in danger of being shot" even after Officer Coon shot Mr. Capps.).

The Officers testified to the same during their depositions. (Doc. No. 60-5 at 52:20–53:5 ("I noticed the door opened, and I saw an arm with a big, large black revolver. . . oriented towards all three of us."); Doc. No. 60-6 at 40:12–15 ("So as soon as I touched, that door opened inside of [Mr. Capps's] residence. I was able to look up here, and I saw a barrel of a gun pointing right at this direction [], right at my head."); Doc. No. 66-N at 11:41:00–11:42:17; 11:44:15–22, 11:48:53– 11:49:00, 11:49:05–50). Mrs. Capps contends that the Court should interpret the Officers' inconsistent recollections on *who* Mr. Capps pointed a gun at—Officer Coon, Officer Rader, or all the Officers—as affirmative evidence that Mr. Capps did not point a gun at *any* of them. (Doc. No. 66 at 14–15). Contrary to Mrs. Capps's assertions, that the evidence is unclear on *which* specific officer Mr. Capps pointed his gun at is of no moment. The evidence indicates that Mr. Capps aimed his weapon toward at least one, if not two or three, of the officers executing his arrest warrants. Moreover, there is no evidentiary basis that Mr. Capps did not point his gun to any of the Officers,

Other evidence in the record confirms as much. This evidence includes: the body camera footage and pictures from the scene showing a handgun on the right side of the hallway (facing the door from inside), next to Mr. Capps's right foot, near where Officer Coon shot Mr. Capps (Doc. No. 67 ¶ 9; Doc. No. 60-8 at 14:12:31; Doc. No. 60-11); the TBI report stating that a Taurus Judge handgun was found at the scene (Doc. No. 66-5); Officer Coon's body camera footage

12

showing his instruction to look for a "black revolver" upon entering Mr. Capps's home (Doc. No. 60-7 at 14:11:25); and Officer Jarvis's BWC footage showing Officer Rader telling Lieutenant Duncan that Mr. Capps pointed a gun "at Kendall." (Doc. No. 66-F at 0:09–04). All of this evidence, taken together, demonstrates that Officer Coon had probable cause to believe Mr. Capps would shoot him or his fellow officers such that his use of deadly force was reasonable. See Jacobs, 915 F.3d at 1041; Rucinski v. City of Cleveland, 655 F. App'x 338, 341 (6th Cir. 2016) ("[W]hen a person aims a weapon in [a] police officer's direction," "that officer has an objectively reasonable basis for believing that the person poses a significant risk of serious injury or death.").

Mrs. Capps presents various pieces of evidence, she contends create a genuine dispute of fact on Mr. Capps's threat level at the time of Officer Coon's use of force, to no avail. First, Mrs. Capps contends that the Court should find a genuine dispute of material fact exists on whether Mr. Capps pointed a gun at the Officers because it is undisputed that the body camera footage is inconclusive on this point. In doing so, Mrs. Capps relies on Heeter v. Bowers for the premise that "the body camera footage takes the place of what would in happier circumstances be testimony of" Mr. Capps such that the Court must construe "gaps or uncertainties" in the videos in Mrs. Capps's favor. 99 F.4th 900, 912 (6th Cir. 2024). While the Court does view the "gaps or uncertainties" in the body camera footage in Mrs. Capps's favor, Mrs. Capps's reading of Heeter is misplaced. In Heeter, an officer fatally shot a suspect who, based on the body camera footage, "put his gun down and asked the officers to leave," began to retreat from the officer, and then took "his hands out of his pockets and started some sort of movement toward the ground." Heeter, 99 F.4th at 913. Despite this evidence, the officer contended that the court had to "accept uncritically all the allegations in his affidavit" that the suspect lunged forward and had a gun in his pocket, despite that not being evident from his body camera footage. Id. at 912. The Sixth Circuit declined

to do so, given "the bodycam footage [was] enough to call [the officer's] allegations into question." Id. Accordingly, the Heeter court found there was a genuine dispute of material fact on whether the suspect posed an imminent threat to the officer such that summary judgment was inappropriate.

This case is different. Here, the bodycam footage provides *no* insight either way on whether Mr. Capps was holding a gun at the Officers when he opened his front door. (Doc. No. 60-7 at 14:10:46; Doc. No. 60-8 at 14:10:49; Doc. No. 60-9 at 14:09:55). Even viewing the footage in Mr. Capps's favor, it supports the Officers' recollection of events. The body camera footage shows: Mr. Capps's handgun located next to his right hand on the floor when the officers enter his home; Officer Coon indicating while searching Mr. Capps's home that a black revolver should be near Mr. Capps's right hand; and Officer Rader telling Lieutenant Duncan that Mr. Capps pointed a gun at Officer Coon. This is a far cry from Heeter, where the footage directly contradicted the officer's self-serving affidavit. Heeter, 99 F.4th at 912–13. Instead, it more closely resembles cases in which the Sixth Circuit credits officer affidavits when nothing in the record contradicts them. See, e.g., Chappell, 585 F.3d at 904–05 (crediting officers' testimony where it was not contradicted by body camera footage).

Mrs. Capps then attacks the Officers' behavior during and immediately after the instant events. Specifically, Mrs. Capps contends that the following creates a factual question or whether Mr. Capps pointed a gun at the Officers: (1) Officer Coon and Officer Rader yelling "Show me your hands," not "Drop the gun!"; (2) Officers Brewer and Rader not drawing their firearms until after Officer Coon shot Mr. Capps; and (3) the SRT team not mentioning Mr. Capps's firearm until "well after passing" by it after entering Mr. Capps's home. (Doc. No. 66 at 8–17). None of these pieces of evidence create a genuine dispute of material fact on whether Mr. Capps posed an immediate threat.

On the third point—the SRT teams' reference to Mr. Capps's gun upon entering the home—is contradicted by the body camera footage showing Officer Coon describing Mr. Capps's gun and how Mr. Capps held it within 30 seconds of entering his home. (Doc. No. 60-7 at 14:10:59–14:11:25). The first two points, what Officers Coon and Rader yelled at Mr. Capps prior to Officer Coon shooting him and when Officers Brewer and Rader drew their weapons, are no more successful. As an initial matter, Officer Coon readily points to undisputed evidence in the record that explains why Officers Brewer and Rader did not draw their guns sooner: Officer Coon was assigned to cover for them. (Doc. No. 67 ¶ 2). Further, the body camera footage shows they still drew their guns within seconds of Officer Coon shooting. (Doc. No. 60-8 at 14:10:50; Doc. No. 60:9 at 14:09:53). As to Officers Coon and Rader not saying to Mr. Capps "Drop the gun!," Mrs. Capps points to no authority supporting her argument that such failure somehow creates a genuine dispute of fact on the issue of imminent threat. This failure is telling considering authority suggesting that the Officers were not required to say anything at all upon seeing Mr. Capps with a gun. Thomas v. City of Columbus, 854 F.3d 361, 365 (6th Cir. 2017) ("It was not feasible for [the officer]—unexpectedly confronted with the barrel of a rifle from five feet away—to give a warning before firing her weapon."). Still, viewing these pieces of evidence in Mrs. Capps's favor, to find a genuine dispute of material fact based on what the Officers said and when they drew their weapons, where the Officers' "split-second" judgments were required, would require this Court to inappropriately impose hindsight bias on officers operating in an undoubtedly stressful situation. See Graham, 490 U.S. at 396–97.

Mrs. Capps's next argument, that Mr. Capps turned away from the SRT team before Officer Coon shot him, showing he was not a threat, is no more persuasive. (Doc. No. 66 at 12). In support, Mrs. Capps relies on Eric Warren, her forensic ballistics expert. Mr. Warren asserts that

15

Mr. Capps turned away from the SRT team before Officer Coon shot him.  (Doc. No. 66-2 ¶¶ 16,

19).  Mr. Warren opines that Mr. Capps had turned away from the SRT team before he was shot

on the medical examiner's determination that "the entrance gunshot wounds" entered Mr. Capps's

"left axilla, his lateral left chest, and his medial left chest, with the trajectory being from left to

right." (Id. ¶ 16).  According to Mr. Warren, this would suggest that Mr. Capps was retreating

from the Officers because he "had begun to turn to his right, away from the officers[.]" (Id.).

However, whether Mr. Capps turned from the Officers prior to Officer Coon shooting, or if Mr.

Capps's body turned because he was shot, cannot be determined from the body camera footage.

(See Doc. No. 60-7 at 14:10:47).

Still, viewing the footage and Mr. Warren's report in Mrs. Capps's favor, and assuming

Mr. Capps did begin to turn away from the SRT team right before Officer Coon shot him, this

creates no more than a "scintilla of evidence" in support of Mrs. Capps's position that Mr. Capps

did not pose an immediate threat to Officer Coon.  See Rodgers, 344 F.3d at 595.   This evidence

is a far cry from those cases Mrs. Capps relies on in which the Sixth Circuit has found there was a

genuine dispute of fact as to whether a suspect was holding a gun at an officer that used deadly

force.  See, e.g., Brandenburg v. Cureton, 882 F.2d 211, 215 (6th Cir. 1989) (reversing lower

court's entry of judgment for officer where there was expert testimony "that the position of the

body after death indicated that the right hand was not grasping the trigger and that the position of

the left arm could not prove that Mr. Brandenburg was aiming his weapon at the officers" and two

other officers present did not fire shots at the suspect); King, 694 F.3d 662–63 (6th Cir. 2012)

(reversing district court's grant of summary judgment for officer where "forensic evidence and

expert testimony call[ed] into serious question" the officers' accounts that the suspect pointed a

gun at them); Naselroad v. Mabry, 763 F. App'x 452, 460–62 (6th Cir. 2019) (reversing the lower

court's grant of summary judgment for officer where the suspect contended that his gun was pointed at the ground and the officers were at the scene to investigate a non-violent, low-level crime); <u>David v. City of Bellevue, Ohio</u>, 706 F. App'x. 847, 851–52 (6th Cir. 2017) (reversing lower court's grant of summary judgment for officer where the testimony was divided on whether the suspect was pointing a gun at the officers).

Indeed, this case is more closely aligned with those in which there was no genuine dispute of material fact that the suspect posed imminent harm to an officer that used deadly force. <u>See, e.g.</u>, <u>Gambrel</u>, 25 F.4th at 405–06 (collecting cases); <u>see also</u> <u>Presnall v. Huey</u>, 657 F. App'x 508, 512 (6th Cir. 2016) (officers acted reasonably in using deadly force when suspect pointed a gun at an ATF agent); <u>see also</u> <u>Boyd v. Baeppler</u>, 215 F.3d 594, 598, 604 (6th Cir. 2000) (use of deadly force reasonable when suspect pointed a gun at officers); <u>Estate of Sowards v. City of Trenton</u>, 125 F. App'x 31, 34, 38–39 (6th Cir. 2005) (same); <u>Whitlow v. City of Louisville</u>, 39 F. App'x 297, 300, 306 (6th Cir. 2002) (same); <u>Sawyer v. City of Soddy Daisy, Tennessee</u>, 2023 WL 1800270, at *1–2 (6th Cir. 2023) (affirming district court's grant of summary judgment in officer's favor where officer shot suspect within two seconds after suspect pointed a gun at him). Considering this authority, if the Court were to find a genuine dispute on whether Mr. Capps posed a threat to Officer Coon because Mr. Capps may have begun to turn away from the Officers within milliseconds of being shot, it would be operating in a "theoretical, sanitized world of" its imagination, rather than the "dangerous and complex" world that Officer Coon faced that day. <u>Smith v. Freland</u>, 954 F.2d 343, 347 (6th Cir. 1992).

Finally, Mrs. Capps raises additional arguments on the unreasonableness of Officer Coon's use of deadly force that do not squarely map onto the <u>Graham</u> factors. While the <u>Graham</u> factors are not exhaustive, <u>Jacobs</u>, 915 F.3d at 1040, none of the purported evidence Mrs. Capps presents

changes the Court's ultimate determination that "the totality of the circumstances justified" Officer

Coon's use of deadly force, given he had probable cause to believe Mr. Capps was going to shoot

him or his teammates.  Garner, 417 U.S. at 8–9.  Specifically, Mrs. Capps urges the Court to

consider the following: Officer Coon knew that Mr. Capps did not "physically" hurt anyone,

although he threatened to shoot responding officers; the Officers failed to properly notify Mr.

Capps of their arrival; and there is evidence showing Officer Coon knew of Mr. Capps's mental

illness prior to executing the arrest warrants. (Doc. No. 66 at 18–19).  In making these arguments,

Mrs. Capps relies on inapplicable cases.  See Palma v. Johns, 27 F.4th 419, 424, 429 (6th Cir.

2022) (addressing excessive force claim where the decedent was bipolar and schizophrenic); Rush

v. City of Mansfield, 771 F. Supp. 2d 827, 856 (N.D. Ohio 2011) (addressing an unlawful entry

case where officers executing a search warrant failed to knock before entering, a conceptually

distinct claim from an alleged excessive force violation).  Further, Mrs. Capps also relies on

evidence that does not support her contentions.  (See, e.g., Doc. No. 66-12 (Officer Lockwood's

testimony stating nothing specific about the alleged "mental health issues" Mr. Capps was

suffering from, nor whether Officer Coon was aware of those issues)).  Most importantly, Mrs.

Capps fails to explain how these pieces of evidence create a genuine dispute of fact as to the

ultimate threat level imposed on Officer Coon at the *moment* of Officer Coon's use of force.  See

Bouggess, 483 F.3d at 889.

At bottom, Officers Coon, Rader, *and* Brewer—the only remaining witnesses from the

scene—testified and told TBI that (1) Mr. Capps pointed a handgun at the Officers from a few feet

away when Mr. Capps opened his front door; (2) Officer Coon knew that Mr. Capps had warrants

against him for aggravated assault and kidnapping, had threatened Mrs. Capps and Ms. Acuff with

a gun, and threatened to shoot responding officers; (3) the Officers believed Mr. Capps was going

18

to shoot them; (4) Officer Coon warned Mr. Capps to show him his hands; and that (5) the only way for Officer Coon to save himself and his fellow officers was to use his weapon (Doc. No. 60-4 at 44:16–46:23, 50:4–20; Doc. No. 60-5 at 52:20–53:5; Doc. No. 60-6 at 21:8–22:4, 40:12–15; Doc. No. 60-7 at 14:10:46; Doc. No. 66-6 at 2; Doc. No. 66-7 at 1–2; Doc. No. 66-8 at 2; Doc. No. 66-N at 11:49:05–50; Doc. No. 67 ¶¶ 1–3). None of the evidence Mrs. Capps provides, viewed in the light most favorable to her, changes these facts. Because the undisputed evidence shows that Mr. Capps pointed a gun at the Officers from only a few feet away, this "end[s] the inquiry because it establishes that [Mr. Capps] 'pose[d] a serious threat of physical harm' and that the use of deadly force was therefore reasonable." Bell, 665 F. App'x at 426 (quoting Garner, 471 U.S. at 7)).

There is "[n]o doubt the use of deadly force by police officers is a serious matter and ought to be avoided—but not at all costs and not in all situations." Hocker v. Pikeville City Police Dep't, 738 F.3d 150, 154 (6th Cir. 2013). Although the Court must view the gaps in the body camera footage in Mrs. Capps's favor, Heeter, 99 F.4th at 912, it cannot fill in those gaps in extremis to create a genuine dispute of material fact where none exists. See Chappell, 585 F.3d at 911 (a court may not give a plaintiff "the benefit of inferences and suppositions that are not only not supported by the record facts, but are directly contradicted by the record facts"). Taking all the evidence together and in Mrs. Capps's favor, the record is clear that "if [Officer Coon] had hesitated [in shooting Mr. Capps]. . . [he, or Officers Rader and Brewer] would have been. . . vulnerable to serious or even fatal injury." Steele v. City of Cleveland, 375 F. App'x 536, 542 (6th Cir. 2010) (internal quotations and citation omitted). As a matter of law, Officer Coon exercised a reasonable use of force when Mr. Capps pointed a gun at him and his fellow officers. Hicks v. Scott, 958 F.3d 421, 435 (6th Cir. 2020) (threat of harm "often turn[s] on whether an armed suspect pointed

19

[his] weapon at another person"). Accordingly, Officer Coon did not violate Mr. Capps's Fourth Amendment rights through his use of deadly force. Rucinski, 655 F. App'x at 341.

### 2. Prong 2: Whether the Right was Clearly Established

The Court turns to the second prong of the qualified immunity analysis, whether Mr. Capps's constitutional right was clearly established. Saucier, 533 U.S. at 201. Because the first question is dispositive here, the Court need not decide the second one. Moore v. Oakland Cnty., Michigan, 126 F.4th 1163, 1167 (6th Cir. 2025) (citing Pearson v. Callahan, 555 U.S. 223, 236 (2009)). Still, the Court will address the second prong. On the second prong of the qualified immunity analysis, Officer Coon may "be shielded from liability for civil damages if [his] actions did not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" Hope v. Pelzer, 536 U.S. 730, 739 (2002) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "For a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Id. at 739 (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)). In determining whether a right is "sufficiently clear," the Court should not define them "at a high level of generality." Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011). This "usually means [Mrs. Capps] must identify a case with facts 'similar enough that' it 'squarely governs this one[.]'" Moore, 126 F.4th at 1167 (quoting Lee v. Russ, 33 F.4th 860, 863 (6th Cir. 2022)) (internal quotations omitted). Still, "[t]his is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, see Mitchell [v. Forsyth], 472 U.S. 511, 535 n.12 (1985); but it is to say that in the light of pre-existing law the unlawfulness must be apparent." Anderson, 483 U.S. at 640; see Harcz v. Boucher, 763 F. App'x 536, 542 (6th Cir. 2019) ("To violate a clearly established right, courts 'do not require a case directly on point, but existing

20

precedent must have placed the statutory or constitutional question beyond debate.'") (quoting <u>al-Kidd</u>, 563 U.S. at 741).

In addressing this prong of the qualified immunity analysis, courts assess the "'objective legal reasonableness' of the allegedly unlawful action 'in light of the legal rules that were clearly established at the time it was taken.'" <u>Hall v. Navarre</u>, 118 F.4th 749, 759 (6th Cir. 2024) (internal citation omitted). In doing so, courts must ask whether "Supreme Court precedent as well as that of the circuit courts" "'placed the . . . constitutional question beyond debate.'" <u>Id.</u> (quoting <u>al-Kidd</u>, 563 U.S. at 741). "If *no* reasonably competent officer would have taken the same action, then qualified immunity should be denied; however, 'if officers of reasonable competence could disagree on [the legality of the action], immunity should be recognized.'" <u>Humphrey v. Mabry</u>, 482 F.3d 840, 847 (6th Cir. 2007) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)). Under this standard, "[q]ualified immunity leave government authorities 'ample room for mistaken judgments.'" <u>Humphrey</u>, 482 F.3d at 847 (quoting <u>Scott v. Clay County</u>, 205 F.3d 867, 873 n.9 (6th Cir. 2000)). Indeed, the "doctrine protects 'all but the plainly incompetent or those who knowingly violate the law.'" <u>Humphrey</u>, 482 F.3d at 847 (quoting <u>Malley</u>, 475 U.S. at 341)).

Officer Coon contends that there is no clearly established law that barred him from using deadly force to stop Mr. Capps, "a violent suspect who ignored commands and pointed a gun at officers." (Doc. No. 59 at 22). Surprisingly, despite Mrs. Capps's affirmative obligation to demonstrate Officer Coon is not entitled to qualified immunity, she fails to identify legal authority demonstrating that Officer Coon's use of deadly force violated Mr. Capps's clearly established Fourth Amendment rights, <u>see</u> <u>Anderson</u>, 483 U.S. at 640. (<u>See generally</u> Doc. No. 66 (not arguing Officer Coon's use of force has been clearly established as a violation of the Fourth Amendment). This omission, at minimum, dooms her claim. <u>Moore</u>, 126 F.4th at 1167 (plaintiff must identify

cases similar enough to her own to establish second prong of qualified immunity). Further, Supreme Court and Sixth Circuit precedent is clear that an officer does not violate a suspect's clearly established rights by using deadly force in response to a suspect's threat of deadly force. See, e.g., Kisela v. Hughes, 584 U.S. 100, 105 (2018) (holding an officer's use of deadly force did not violate clearly established law when the suspect was wielding a kitchen knife and the officer "had mere seconds to assess the potential danger"); see also supra, Section III.1.

Considering the foregoing, Mrs. Capps cannot establish that Officer Coon violated Mr. Capps's clearly established Fourth Amendment rights. Officer Coons is entitled to qualified immunity on Mrs. Capps's § 1983 claim.

## IV. CONCLUSION

Based on the undisputed facts and body camera footage in the record, the Court does not and cannot conclude that Officer Coon's exercise of deadly force was unreasonable. Therefore, for the foregoing reasons, Officer Coon's Motion for Summary Judgment (Doc. No. 58) will be granted, and Mrs. Capps's Fourth Amendment claim against Officer Coon will be dismissed with prejudice.[7]

An appropriate order will enter.

_____
WAVERLY D. CRENSHAW, JR.
UNITED STATES DISTRICT JUDGE

---

[7] Dismissal with prejudice is warranted, given qualified immunity is a defense against suit itself. See Johnson, 790 F.3d at 653.